UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CORY ISAACS

        Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

                **REPORT AND
RECOMMENDATION**

                07-CV-00257(A)(M)

    This case was referred to me by Hon. Richard J. Arcara to hear and report in accordance with 28 U.S.C. §636(b)(1) (Dkt. # 6). Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dkt. ##11, 13). For the following reasons, I recommend that defendant's motion for judgment on the pleadings be DENIED (Dkt. #11), and that plaintiff's cross-motion (Dkt. #13) be GRANTED.

**PROCEDURAL BACKGROUND**

    Pursuant to 42 U.S.C. §§405(g) and 1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security, denying his application for Supplemental Security Income Benefits ("SSI") (Dkt. # 1).  Plaintiff , as a minor (DOB: 7/17/1986), filed an application for SSI on August 3, 2001.  He was found disabled as of July 1, 2001 under SSI Childhood Disability Standards as a result of an anxiety disorder (T123-125, 30-32).[1]

_____

   [1]  Reference to "T" are to the certified transcript of the administrative record filed by the defendant in this action.

Plaintiff's SSI benefits were reviewed when he attained age 18 (T46-48). On May 24, 2005, the Social Security Administration issued a Disability Redetermination finding that plaintiff was not disabled as an adult (T49-52). Plaintiff's mother, Andrea Marksberry, filed a request for reconsideration of disability cessation on August 9, 2005 (T53-55). On January 26, 2006 a Disability Hearing Officer found that plaintiff was no longer disabled (T77-91).

On July 19, 2006 an administrative hearing was conducted before Administrative Law Judge Timothy M. McGuan (T542-583).  Plaintiff was represented at the hearing by Alan B. Brock, Esq. (T108). On September 8, 2006, ALJ McGuan issued a decision finding plaintiff not disabled beginning on May 1, 2005 (T10-29).  ALJ McGuan's determination became the final decision of the Commissioner on January 3, 2008 when the Appeals Council denied plaintiff's request for review (T5-9).

## THE ADMINISTRATIVE RECORD

I.   **Medical Evidence**

A.   **Childhood Determination**

On December 14, 2000 plaintiff was treated at the Upper West Side Family Health Center for dizziness, nauseousness, and some loss of appetite and abdominal pain (T229). She did not note any physical abnormalities and suggested that plaintiff take Mylanta and remain home from school for the rest of the week (Id.).

On January 18, 2001 plaintiff was admitted to the Erie County Medical Center Comprehensive Psychiatric Emergency Program (T230-241). Plaintiff admitted he did not attend school since an anxiety attack one month earlier and Ms. Marksberry reported that plaintiff had

suffered previous anxiety attacks (T233). She also reported that plaintiff had not eaten for two days and complained of nausea, headaches and dizzy spells (Id.).  Plaintiff was diagnosed with a depressive disorder, assigned a GAF score of 41-50, and prescribed Zoloft (T238, 240). [2]

In January 2001 plaintiff was referred to Child Adolescent and Treatment Services ("CATS") (T329, 333). On January 23, 2001 plaintiff presented problems with "school adjustment performance", depression, and anxiety (T508, 333).  On January 24, 2001 therapist Laura Abrams, BA diagnosed plaintiff with separation anxiety disorder and assigned him a GAF score of 38 (T504).[3] On February 12, 2001 Ms. Marksberry cancelled therapy with Ms. Abrams because plaintiff complained his Zoloft was giving him stomach pain (T336). Psychiatrist Helen Aronoff, M.D., discontinued the medication on February 27, 2001 due to GI distress and plaintiff's improved energy (T338).  Plaintiff frequently complained that his medications, caused GI distress (T337, 485, 351, 484, 355, 370, 371, 387).  However, on March 14, 2001, Dr. Aronoff prescribed Paxil with continued counseling because plaintiff  remained out of school (T500).

On March 22, 2001 plaintiff refused to attend his therapy session (T342). On April 30, 2001 plaintiff and his mother reported that he had suffered fewer symptoms of depression since starting treatment, but on June 5, 2001 Ms. Marksberry reported that plaintiff's

---

[2]     A score between 41-50 represents "serious symptoms OR any serious impairment in social, occupational, or school functioning". American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, IV- Test Revision (*DSM*-IV) at 34.

[3]     A score between 31-40 represents "some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood". American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, IV- Test Revision (*DSM*-IV) at 34.

symptoms had worsened and he refused to attend a May 24, 2001 therapy session because he felt sick (T348). Dr. Aronoff discontinued plaintiff's Paxil on June 13, 2001 and proscribed Prozac (T485).

On July 2, 2001 Ms. Marksberry informed therapist Kristina Carpenter, BA, that plaintiff's symptoms had worsened and he refused to take his medication (T350). On July 19, 2001 plaintiff refused to attend therapy because he was angry at his mother and stayed out until 1:00 a.m. the previous night to spite her (T352). On August 1, 2001 Dr. Aronoff prescribed Zoloft daily (T484), but on August 2, 2001, Ms. Marksberry reported that plaintiff was not taking his medication (T353). On August 14, 2001 Ms. Carpenter noted that plaintiff "is inconsistent with appointments. Dr. Arnoff has prescribed 3 different meds. [Plaintiff] is refusing meds." (512).

From August 15, 2001 until September 27, 2001 plaintiff continued to refuse medications because of GI discomfort or fear of experiencing GI discomfort (T353, 355, 326, 483, 359, 360-363). On August 15, 2001 Dr. Aronoff discontinued plaintiff's Zoloft after plaintiff reported that despite not taking his medications, he was motivated to return to school (T483). However, therapist Nicole Paternella reported, that plaintiff had not returned to school on September 5, 2001and demonstrated possible signs of "school phobia" (T357). On September 10, 2001 Dr. Aronoff prescribed Celexa daily (T482). On September 27, 2001 Ms. Paternella informed Ms. Marksberry that "everyone's hands are tied b/c [plaintiff] is refusing all types of treatment" (T368).

On October 1, 2001 plaintiff reported that he was taking his medication (Id.). Nurse Paternella noted "some manipulation on plaintiff's part re: school.  No consequences given

[plaintiff] for not following through with plans" (<u>Id</u>.). On October 10, 2001 plaintiff reported his medications sometimes helped control his anxiety (T371).  On October 30, 2001 plaintiff was still taking his medications, but they "are not making a difference" (T383).

On October 31, 2001 Dr. Aronoff noted that plaintiff felt less anxious and depressed on Celexa, but that Ms. Marksberry was "unable/unwilling to enforce school attendance" despite allowing plaintiff to play football and rollerblade with his friends (T261, 478).

In a November 13, 2001 letter to the Erie County Department of Social Services ("Social Services"), CATS advised that Ms. Marksberry and plaintiff had canceled an appointment on November 3, 2001 and failed to appear for a November 12, 2001 appointment (T474).  CATS also reported that they failed to follow through on their recommendations, which led them "to question [their] ability to utilize outpatient treatment [and] request[ed] a higher level of care and that [plaintiff] be considered for residential placement" (T475). On December 6, 2001 Ms. Marksberry informed Ms. Paternella that plaintiff stopped taking his medications and seemed "to be going back to his old ways (not talking, depressed)" (T396).

On January 24, 2002 CATS informed Social Services that:

> "For the most part, progress has been minimal. However, recently. . .have been able to engage [plaintiff] more fully. . . . Based on what [plaintiff] has shared in counseling of late and consultation with Dr. Arnoff, his diagnosis has been changed from Separation Anxiety Disorder to Oppositional Definat Disorder and R/O Generalized Disorder. . . . outpatient treatment still may not meet [plaintiff's needs].  He has come in recently unwilling to participate and has also requested shortened appointments. [Plaintiff] has not attended school all year, but plays hockey and socializes with friends (has a girlfriend, goes to the movies and goes ices [sic] skating, etc.)" (T472).

In a February 12, 2002 Universal Referral form requesting a higher level of care for plaintiff, Jean Milliken, CSW, reported that plaintiff's emotional disturbances severely impaired his school performance/learning ability and self direction, while it moderately impacted his social relationships and family life (T465).

On March 26, 2002 Ms. Milliken noted that "continuously since the fall of 2001, [plaintiff] has stated that he's too anxious to separate from his mother but plays hockey, and goes to his girlfriend's and other friend's houses (many times without his mother)" (T457).

On October 1, 2002 Dianna C. Buchholtz, MS, performed a psychological evaluation on plaintiff for the Buffalo Public Schools (T202). Plaintiff's was in the normal range across eight categories of behavior and did not demonstrate any problem behaviors (Id.). Ms. Buchholtz did not witness any significant processing deficits and plaintiff admitted he no longer felt anxious at school and "that everything is fine now and doesn't feel like he did last year" (T203). She also stated that agency counseling appeared to address plaintiff's needs and concluded that he did not qualify for special education (T204).

After a series of failed and cancelled appointments (T439-443), CATS closed plaintiff's case on January 8, 2003 (T448). At that time, plaintiff had a GAF Score of 50 (T446).

**B.     Redetermination**

On July 18, 2006 Lawrence VanHeusen, LCSMR, conducted a pre-assessment screening for the Jewish Family Service of Buffalo and Erie County Medical Clinic. Plaintiff stated he was "strongly motivated to stop the course of agoraphobia so that he can pursue a career in hockey and become educated" (T526). In a August 9, 2006 Bio-Psycho-Social Assessment Mr.

VanHeusen reported that plaintiff's mood appeared fearful/anxious, angry and depressed, but his thought process and stream of speech appeared intact, clear, logical and spontaneous (T514). He diagnosed plaintiff with panic disorder with agoraphobia, depressive disorder, R/O separation anxiety disorder and assigned a GAF score of 51, with plaintiff reaching a high score of 55 in the past year (T518-519).[4] Mr. VanHeusen suggested plaintiff receive individual and family treatment, case management, and medication and vocational evaluations (T519).

On August 22, 2006 Mr. VanHeusen completed a Source Statement of Ability to do Work-Related Activities (Mental) finding that plaintiff's impairments did not affect his ability to understand, remember and carry out instructions (T532), but moderately affected his ability to interact appropriately with the public, sightly affected his ability to interact appropriately with co-workers and supervisors, and markedly impacted his ability to respond appropriately to work pressures in a usual work setting, and slightly affected his ability to respond appropriately to changes in a routine work setting (T533). Mr. VanHeusen also noted that plaintiff experiences high levels of stress in group situations, which forces him to escape and affect his ability to travel, including to work, because he "anticipates panic attacks and returns home immediately to avoid having one" (Id.). However, plaintiff had recently walked two blocks with Mr. VanHeusen, but did not show signs of a panic attack (Id.). Mr. VanHeusen concluded that plaintiff's "early progress look[ed] promising" (Id.) and stated on August 25, 2006 that plaintiff's "prognosis for recovery is good, but he has not been taught adequate coping skills until now" (T524).

---

[4]     A score between 51-60 represents "moderate symptoms OR moderate difficulty in social, occupational, or school functioning." American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, IV- Test Revision (*DSM*-IV) at 34.

## II.      Consultative Examinations and State Agency Review Consultants

### A.      Childhood Determination

On October 22, 2001 psychologist Rachel Hill, Ph.D., diagnosed plaintiff with agoraphobia and panic disorder (T246-249).  Although plaintiff's program was good, she opined that plaintiff should receive treatment geared for treating agoraphobia (T249). She observed that plaintiff was having significant problems with his ability to function and suffered panic attacks that included hot flashes, dizziness, and nausea (T246).  Dr. Hill found that plaintiff's reported symptoms were consistent with her observations (T248).

On November 20, 2001 Madan Mohan, Ph.D., a state agency review psychologist, completed a Childhood Disability Evaluation form for plaintiff (T252-257). She opined that plaintiff met Listing 112.06 A and B (T252) and his allegations were consistent with clinical findings (T255).

### B.      Redetermination

On March 31, 2005 and October 6, 2005, psychologist Thomas Ryan, Ph.D., performed consultative examinations and diagnosed plaintiff with panic disorder with agoraphobia and borderline intellectual functioning disorder (78 IQ) (T262-265, 293-297). Dr. Ryan noted that plaintiff

> "can follow and understand simple directions and perform simple
> task [*sic*].  He can maintain attention and concentration.  He can
> maintain a regular schedule.  He would be somewhat slower to learn
> new tasks.  He may have difficulty with complex tasks.  Decision
> making is adequate for daily decisions.  He has difficulty relating
> with others and dealing with stress.  Results of the evaluation are
> consistent with psychiatric and cognitive problems which may

-8-

interfere to some degree with his ability to function on a daily basis" (T264-265).

He recommended that plaintiff receive individual psychological therapy, psychiatric intervention and, once stable, vocational training (Id.).

On May 20, 2005, psychologist P.A. Spearman, Ph.D., a state agency review consultant, completed a psychiatric review technique (T270) and a mental residual functional capacity assessment (T284). He opined that plaintiff suffered from borderline intellectual functioning disorder, panic disorder with agoraphobia, and separation anxiety disorder, as per Dr. Ryan and CATS, (T271, 275). He also opined that plaintiff had moderate restrictions with daily activities; had moderate difficulty in maintaining social functioning, concentration, persistence or pace; and never repeated episodes of deterioration (T280). Dr. Spearmen concluded that "based upon the objective findings in file and the MER as a whole, the claimant retins [sic] the capacity for understanding, remembering, carrying out simploe [sic] instructions, adapting to changes in the workplace, making simple related decisions and responding appropriately to supervision and coworkers. He retains the capacity for the performance of unski8lled [sic] work" (T285).

On November 29, 2005 M. Totin, Psy.D., a state agency review consultant, completed a psychiatric review technique (T298) and a mental residual functional capacity assessment (T312).  Dr. Totin opined that plaintiff suffered from borderline intellectual functioning disorder and a panic disorder with agoraphobia (T299, 303).  He stated that plaintiff only had a mild restriction performing daily activities; has mild difficulties in maintaining social functioning, concentration persistence or pace; and has never repeated episodes of deterioration (T308).  Dr. Totin concluded that plaintiff's "thought processes were noted to be coherent and

goal directed, affect was appropriate, mood was neutral . . . . Attention, concentration and memory were minimally impaired, insight and judgment were fair.  He is able to perform ADL's. He is able to follow and understand simple directions and perform simple tasks. He could maintain attention and concentration" (Id.).

## III.   Administrative Hearing Conducted on July 19, 2006

### A.   Ms. Marksberry's Testimony

Ms. Marksberry testified that plaintiff had been in counseling since he was nine (T549), but withdrew from CATS because he did not believe they were helping him (T574). She stated that plaintiff was rebelling from the constant change in medications and counselors and being sick from the medication (T574).  However, in October of 2005, plaintiff realized that he needed help and Ms. Marksberry tried to schedule counseling at Linwood and Horizon, but plaintiff could not keep appointments because he felt the locations were too far away (T551, 555). Therefore, Mrs. Marksberry scheduled an appointment for plaintiff at Jewish Family Services on July 24, 2006 (T548).

Ms. Marksberry stated that plaintiff previously worked in the kitchens at Jim's Steak Out (T211, 555) and LaNova (T558) and also cleaned an ice rink (T556).  Plaintiff no longer worked at the ice rink because it was a temporary position and he stopped working at the two restaurants because the "feelings" would come back (Id.).

Regarding plaintiff's daily activities, Ms. Marksberry testified that plaintiff goes to sleep between 4-6 a.m. and wakes up between 11 a.m. and 1 p.m. (T559).  He plays pool and video games, watches TV (Id.), uses the internet and has three friends that visit him (T570). Ms.

Marksberry testified that plaintiff does not see anyone outside the house and does not go to the movies (Id.).  Although plaintiff had played hockey, he no longer played (T560).  Plaintiff's anxiety prevented him from attending family functions (T563). Ms. Marksberry stated that when plaintiff gets sick he begins to pace, feels that he is physically sick, becomes nauseous and begins to shake (T552).

ALJ McGuan requested plaintiff's medical records from CATS between January 2001 and December 2002 (T568).

**B.     Other Submissions**

Plaintiff voluntarily waived his presence at the administrative hearing (T545), but submitted a letter on his behalf explaining that his impairments prevented him from attending the hearing (T211-212). Plaintiff's grandmother and sister also submitted letters (T316-318)

### ALJ  McGuan's September 8, 2006 Decision

ALJ McGuan determined that plaintiff's separation anxiety disorder was a severe impairment (T15), but concluded plaintiff "did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4" (T19).

He found that as of May 1, 2005 plaintiff had an "essentially unlimited" physical residual functional capacity (T19-20).  Although plaintiff had no past relevant work experience, ALJ McGuan concluded that plaintiff's limitations did not prevent him from performing a

significant number of jobs in the national economy insofar as he could perform unskilled work at all exertional levels since May 1, 2005 (T28-29).

## DISCUSSION AND ANALYSIS.

I.        **Scope of Judicial Review**

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g).  Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion".  Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited.  This Court may not try the case *de novo*, nor substitute its findings for those of the Commissioner.  Townley v. Heckler, 748 F. 2d 109, 112 (2d Cir. 1984).  Rather, the Commissioner's decision may be reversed only when it is based on legal error or is not supported by substantial evidence in the record as a whole.  Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998).  If supported by substantial evidence, the Commissioner's decision must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner.  Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, I must first determine "whether the Commissioner applied the correct

legal standard". <u>Tejada v. Apfel</u>, 167 F. 3d 770, 773 (2d Cir. 1999).  "Failure to apply the correct

legal standards is grounds for reversal." <u>Townley</u>, <u>supra</u>, 748 F. 2d at 112.


**II.     The Disability Standard**

        The Social Security Act provides that a claimant will be deemed to be disabled "if

he is unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which . . . has lasted or can be expected to last for a continuous

period of not less than twelve months."  42 U.S.C. §1382c(a)(3)(A).  The impairments must be

"of such severity that he is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy . . . ."  42 U.S.C. §1382c(a)(3)(B).

        The determination of disability entails a five-step sequential evaluation process:

"1.     The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.     If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3.     If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.     If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

> 5.   If the claimant is unable to perform his or her past work, the
>       Commissioner then determines whether there is other work
>       which the claimant could perform.  The Commissioner bears
>       the burden of proof on this last step, while the claimant has
>       the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000); see 20 C.F.R. §§404.1520, 416.920.

## III.   Analysis

### A.   ALJ McGuan Erred in Finding that Plaintiff's Panic Disorder with Agoraphobia and Borderline Intellectual Functioning Were Not Severe Impairments.

Plaintiff argues that ALJ McGuan erred in failing to consider his panic disorder with agoraphobia and borderline intellectual functioning severe impairments (Dkt. #15, n. 24). A severe impairment is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §404.1520(c).  "The analysis at this step may not accomplish more than screening out *de minimis* claims. If, however, the disability claim rises above the *de minimis* level, then the analysis must proceed to step three."  Mattei v. Barnhart,  2003 WL 23326027, *6 (E.D.N.Y. 2003) (citing Dixon v. Shalala, 54 F. 3d 1019, 1030 (2d Cir. 1995)).

Plaintiff was diagnosed with separation anxiety disorder, panic disorder with agoraphobia, and borderline intellectual functioning.  Plaintiff's  limitations were generally assessed based on a combination of these conditions.  Nevertheless, despite concluding that separation anxiety disorder was a severe impairment, ALJ McGuan found that plaintiff's panic disorder with agoraphobia and borderline intellectual functioning, either individually or cumulatively, were not severe impairments.

-14-

Mindful that "the existence of a severe impairment serves only as a threshold to be met for the purpose of screening out *de minimis* claims", <u>Glavan v. Barnhart</u>,  2004 WL 2326384, *7 (E.D.N.Y. 2004), ALJ McGuan's conclusion  that plaintiff's  panic disorder with agoraphobia and borderline intellectual functioning were not severe impairments was not supported by substantial evidence. <u>See</u> <u>Baker v. Apfel</u>, 1998 WL 683773, *5 (W.D.N.Y. 1998) (Heckman, MJ) ("Courts have held that 'borderline' I.Q. is a 'severe impairment causing nonexertional limitations.' " (citing cases)).

"If the existence of a severe impairment is discerned, the agency must then determine, at step three, whether *that* impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1." <u>Burden ex rel. AA v. Commissioner of Social Sec.</u>,  2008 WL 2778848, *4 (N.D.N.Y. 2008) (emphasis added). Therefore, ALJ McGuan's failure to assess plaintiff's borderline intellectual functioning and panic disorder with agoraphobia as severe impairments infected his subsequent analysis of whether only plaintiff's separation anxiety disorder met the listing requirement and requires remand.  <u>See</u> <u>Scott-Flax v. Astrue</u>, 2007 WL 2263879, *5 (W.D. Va. 2007) ("These step-two errors inevitably infected the ALJ's subsequent analytical steps, including steps three, four and five; and require remand.").[5]

---

[5]    Having concluded that ALJ McGuan failed to consider plaintiff's anxiety disorder with agoraphobia  and borderline intellectual functioning as severe impairments, I need not address plaintiff's arguments concerning whether ALJ McGuan properly applied listing 12.06, which was assessed based solely on plaintiff's separation anxiety disorder.

**B.**     **ALJ McGuan Erred in Relying on the Medical Vocational Guidelines to Determine Plaintiff's Vocational Capacity.**

Plaintiff argues that his non-exertional impairments impacted his residual functional capacity, which prohibited ALJ McGuan from relying solely on the Medical Vocational Guidelines (the "Grids") in determining that these non-exertional limitations had no effect on his ability to perform unskilled work at all exertional levels (Dkt. #13, p. 25). Defendant responds that ALJ McGuan properly relied on the Grids because plaintiff's "non-exertional limitations did not 'significantly' erode the occupational base permitted by the plaintiff's exertional abilities" (Dkt. #14, p. 9).

"If the grids accurately and completely describe a claimant's impairments, an ALJ may apply the grids instead of taking testimony from a vocational expert. If they do not, then the ALJ must also hear testimony from a vocational expert." Holohan v. Massanari, 246 F. 3d 1195, 1208 (9th Cir. 2001). "The grids, however, which are designed to assume that the claimant has a certain 'exertional' capacity . . . are *not* designed to take account of significant 'non-exertional' impairments . . . . Non-exertional limitations include nervousness, anxiety, depression, difficulty maintaining attention or concentrating, and difficulty toleration dusts or fumes. . . .The Second Circuit has held that 'if a claimant's non-exertional impairments significantly limit the range of work permitted by h[er] exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's non-exertional impairments,' and 'application of the grids is inappropriate.' " Burgos v. Barnhart, 2003 WL 21983808, *18 (S.D.N.Y. 2003) (quoting Bapp v. Bowen, 802 F. 2d 601, 605 (2d Cir. 1986)). Therefore, "where the claimant's ability to work is 'significantly diminished' by non-exertional

-16-

impairments, the Commissioner must present the testimony of a vocational expert regarding the existence of jobs in the national economy for a person with the plaintiff's limitations." Burgos, supra 2003 WL 21983808 at *18.

ALJ McGuan found "as of May 1, 2005, [plaintiff's] ability to perform work at all exertional levels has been compromised by non-exertional limitations.  However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels" (T29). "Unskilled work requires the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and work situations; and to deal with changes in a routine work setting." Lopez v. Barnhart, 2008 WL 185963, *10 (S.D.N.Y. 2008) (citing SSR 85-15, 1985 WL 56857, *4 (1985)).  "Thus, even a person whose vocational factors of age, education, and work experience would ordinarily be considered favorable should be considered disabled if she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, co-workers, and usual work situations." Id.

ALJ McGuan's assessment fails to account for plaintiff's significant non-exertional limitations, including his borderline intellectual functioning.  See Swope v. Barnhart, 436 F. 3d 1023, 1025 (8th Cir. 2006) ("borderline intellectual functioning, if supported by the record . . . is a significant non-exertional impairment *that must* be considered by a vocational expert").  Mr. Van Heusen found that plaintiff had *marked* limitations in responding appropriately to work pressures in a usual work setting (T533) (emphasis added).  This assessment, which supports plaintiff's contention that he is unable to respond to usual work situations (a requirement of performing unskilled work), was ignored by ALJ McGuan.  See Lopez, supra.  Moreover, ALJ McGuan's

assessment is internally inconsistent.  See Gallivan v. Apfel, 88 F. Supp. 2d 92, 99 (W.D.N.Y.

2000) (Larimer, J.) (remanding where ALJ found that the plaintiff's non-exertional limitation "did

not significantly affect her employment opportunities", but that her non-exertional limitations

"interfere with her ability to work").

Therefore, even if ALJ McGuan properly met his obligations at step two, the

record does not support his reliance solely on the Grids in determining that plaintiff could perform

a full range of unskilled work.  Therefore, he should have introduced testimony from a vocational

expert.

### C.      ALJ McGuan Properly Assessed Plaintiff's Credibility

Plaintiff argues that his treatment files from CATS  were irrelevant to the

redetermination hearing and ALJ McGuan improperly used this information to assess plaintiff's

credibility (Dkt. #13, p. 21).  Plaintiff also argues that ALJ McGuan erred by allowing Ms.

Marksberry's credibility to impact his assessment of plaintiff's credibility (Dkt. #13, p. 22). In

response, defendant argues that the ALJ properly assessed plaintiff's credibility and correctly

included the CATS records because ALJ McGuan had a duty to develop plaintiff's sparse

treatment record (Dkt #14, p. 6). ALJ McGuan also properly included Ms. Marksberry's statement

in plaintiff's credibility determinations as plaintiff voluntarily introduced this evidence (Id. at p.

8).

"By statute, an ALJ is duty bound not only to develop a claimant's complete

medical history for at least twelve months prior to the filing of an application for benefits, 'but

also to gather such information for a longer period if there [is] reason to believe that the

information [is] necessary to reach a decision.' " Aull v. Astrue, 2008 WL 2705520, *12

(N.D.N.Y. 2008)(quoting DeChirico v. Callahan, 134 F. 3d 1177, 1184 (2d Cir. 1998)). This duty

extends to developing the record for credibility determinations. See Miller v. Sullivan, 953 F. 2d

417, 422 (8th Cir. 1992)(finding that the ALJ should have sought specific documentation from

plaintiff if he felt that plaintiff's credibility rested on whether a doctor prescribed her a walker);

see also Trice v. Astrue, 2008 WL 795128, *9 (N.D.N.Y. 2008)("Since the ALJ's analysis of

plaintiff's credibility intertwined with plaintiff's alleged pain and depression, and the Court is

remanding this action for further proceedings with regard to plaintiff's mental impairment, it

follows that the ALJ may decide to further develop the record regarding his assessment of

plaintiff's credibility"). "The applicable regulations supplement this statutory requirement,

directing that an ALJ subpoena a prior disability file pertaining to the claimant if deemed

'reasonably necessary for the full presentation of [the] case.' " Aull, supra, 2008 WL 2705520 at

*12 (quoting DeChirico, supra, 134 F. 3d at 1184).

        I find that ALJ McGuan's inclusion of plaintiff's records from his prior treatment

with CATS was proper, because these records permitted him to fully assess plaintiff's credibility

in light of the sparse treatment record and lapses in treatment. "An evaluation of claimant's

credibility is entitled to great deference if supported by substantial evidence." Matejka v.

Barnhart, 386 F. Supp. 2d 198, 205 (W.D.N.Y. 2005) (Siragusa, J.). "In assessing the claimant's

credibility, the ALJ must consider *all* evidence in the record and give specific reasons for the

weight afforded to the claimant's testimony". Id. (emphasis added). In addition to the objective

evidence the ALJ must consider:

"(1) The individual's daily activities; (2) The location, duration, frequency and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measure other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." Matejka, supra, 386 F. Supp. 2d at 205-206; see 20 C.F.R. §404.1529(c)(4).

ALJ McGuan found that "as of May 1, 2005, the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (T26). In making this assessment, ALJ McGuan noted various inconsistencies in the record including:

"Numerous statements in the record indicate that the claimant is unable to leave his house without a family member. However, the counseling records also state that the claimant breaks curfew, he leaves the house without letting his mother know where he is going, he plays hockey, he has a girlfriend, he has a child, and he has friends with whom he plays football and roller blades. The claimant's grandmother wrote a letter in support of disability stating that the claimant had not gone to the movies since he was 8 or 9 years old. However, the claimant told his counselor that he went to the movies with his girlfriend. The claimant reportedly could not stay alone because of anxiety when his mother was hospitalized, staying the first night with her in the hospital and then staying at his grandmother's house. However, there is an indication on the record that the claimant's mother went out of town one time and the claimant stayed alone" (Id.).

As to claimant's daily activities, ALJ McGuan noted that

"the claimant and his mother allege an inability to concentrate or sit still. However, the evidence in the record establishes that the claimant spends a lot of time playing video sports game, watching television and

-20-

> plays cards with friends. The claimant's mother testified that she did not
> know that the claimant could receive in-home counseling. However, the
> record establishes that the claimant advocated strongly for the claimant to
> receive home schooling, she was able to obtain transportation from counseling
> agencies when none was available to her, and she was able to obtain in-home
> services from [CATS]" (T27).

He also noted that claimant had not sought treatment from December 2002 until after the

administrative hearing (Id.).

      Plaintiff's claim that it was improper for ALJ McGuan to rely upon Ms.

Marksberry's credibility in assessing plaintiff's credibility is misplaced. In fact, the regulations

specifically provide that a claimant can introduce evidence in support of his disability, including

"statements you *or others* make about your impairment(s), your restrictions, your daily activities,

your efforts to work". 20 C.F.R. §416.912(b)(3); see SSR 96-7P, 1996 WL 374186, *8 (S.S.A.)

(1996) ("Other sources may provide information from which inferences and conclusions may be

drawn about the credibility of the individual's statements. Such sources may provide information

about the seven factors listed in the regulations and may be especially helpful in establishing a

longitudinal record. Examples of such sources include . . . nonmedical sources such as family and

friends."). Having chosen to rely extensively on Ms. Marksberry's testimony in support of his

disability claim, it was entirely proper for ALJ McGuan to rely on this evidence in  assessing

plaintiff's credibility.

      ALJ McGuan's extensive evaluation of plaintiff's credibility demonstrates that he

applied the appropriate factors and clearly illustrates his rationale. Therefore, I conclude that his

credibility assessment was proper and supported by substantial evidence.

## CONCLUSION

For these reasons, I recommend that defendant's motion for judgment on the pleadings (Dkt. # 11) be DENIED, and that plaintiff's cross-motion be GRANTED (Dkt. # 13) to the extent he seeks to vacate determination and to remand the case to the Commissioner for further proceedings consistent with this Report and Recommendation.

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such

-22-

objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.</u>

**SO ORDERED**.

DATED:      December 15, 2008

_____

JEREMIAH J. MCCARTHY
United States Magistrate Judge